**WYOMING NAT. BANK OF WILKES BARRE, PA., v. CURL & BENNETT, Inc.**

**No. 1090.**

District Court, M. D. Pennsylvania.
Aug. 6, 1937.

Andrew Hourigan and Max Rosenn, both of Wilkes Barre, Pa., for plaintiff.

Jos. P. Flanagan, Frank L. Pinola and Nathan Hyman, all of Wilkes Barre, Pa., for defendant.

WATSON, District Judge.

The First National Bank of Wyoming, Pa., filed exceptions to the amended first and final account of the receiver. Testimony was taken and the matter is now before the court for disposition.

The exceptant filed thirty-one exceptions. Exceptions 21 to 30, inclusive, were withdrawn at the hearing. The twenty-one exceptions remaining may be divided into four groups. Exceptions 2 to 6, inclusive, relate to the salary of C. W. Bennett, who was employed by the receiver as manager at a salary of $200 per month for a period of 2½ months. Exceptions 7 to 12, inclusive, relate to traveling expenses incurred by C. W. Bennett, totaling $184.60. Exceptions 13 to 20, inclusive, relate to wages of workmen amounting to $1,462.98. Exceptions 1 and 31 relate to the receiver's method of accounting for the difference between the appraised value of the assets and the price realized therefor at public sale. The difference amounts to $29,086.90, and the court is urged by the exceptant to surcharge the receiver that amount.

From the evidence. the court finds the following facts:

January 31, 1934, the Wyoming National Bank of Wilkes Barre, Pa., filed a bill of complaint against Curl & Bennett, Inc., then engaged in the business of silk throwing, praying for the appointment of a receiver to preserve and protect the assets of the corporation. February 13, 1934, the defendant joined in the prayer of the bill, and, on the same day, the court appointed Theodore Alexander, at that time cashier of the Wyoming National Bank of Wilkes Barre, as receiver. At the time Theodore Alexander was appointed receiver, he agreed to serve without compensation. His appointment was concurred in by all parties in interest who were present at the time, including the representatives of the exceptant. The receiver was authorized to continue the business of the corporation for a period of 90 days, and was directed to file, at the end of that period, a written report of the conduct and operation of the business, and ask for further instructions.

For 6 months prior to the receivership, the corporation had sustained losses, and for the 2 months immediately preceding the receivership, it was not in operation.

Upon his appointment, the receiver engaged C. W. Bennett to assist in the conduct of the business. The receiver himself had no knowledge of the silk industry and was obliged to rely entirely upon the knowledge and skill of some other person. Mr. Bennett was a part owner of the corporation, had invested large sums of money in the business, and had acted as general manager of the corporation for several years prior to the receivership at a salary of $500 monthly. The receiver continued his duties as cashier of the Wyoming National Bank and made no more than three visits to the corporation's plant during the entire receivership, although he and Bennett consulted about the business on at least 3 or 4 days of each week.

Mr. Bennett devoted his entire time to his duties in connection with the conduct of business. He made several trips to New York and Philadelphia, where he solicited business. He performed all the clerical work growing out of the business and spent most of his time in and about the plant of the corporation. After his employment ended, he continued to care for the plant and made many attempts to interest people in the business. Some business was secured by Mr. Bennett, and the plant was operated for short periods of time up until May 15, 1934. The result of the operation was an operating loss of over $2,000. By May 8, 1934, it became apparent that the business could not be operated at a profit and operations were suspended. From May, 1934, until November, 1934, the plant was maintained in a condition fit to operate, but thereafter was shut down permanently. Only small incidental expenses were incurred by the receiver since that time. Apparently the inability of the corporation to obtain business was due to the fact that the market for the product produced by it dis-

appeared shortly before the receivership was instituted and did not return.

The operating loss during the receivership is more than offset by advancements totaling $2,500 made by the Wyoming National Bank of Wilkes Barre through the purchase of receiver's certificates.

The receiver did not file a report at the expiration of 90 days as required by the order of court appointing him. Although repeatedly urged by the attorney for the exceptant and by an attorney for wage claimants to make a report, to file an account, and to obtain authority to liquidate the assets of the corporation, the receiver took no action. On April 27, 1935, after he had been served with a rule to show cause why he should not file an account, the receiver filed a report. No other report was made to the court until May 19, 1936, when the receiver reported that he had been unable to operate the business successfully, had been unable to secure adequate bids for the assets of the corporation, and asked leave to sell the assets at public sale free and clear of all liens and encumbrances. The lienholders consented to the sale free and clear of liens, and the court ordered the sale free and clear of liens, and directed that the liens be transferred to the fund derived from the sale. All the assets, real and personal, were sold at public sale to the Wyoming National Bank, the highest bidder, for the total sum of $900. The purchaser was a first mortgage creditor and held other obligations of the corporation to a total of approximately $19,000. No exceptions to the sale were taken by the present exceptant, although it had notice of the entire proceedings. The sale was confirmed absolutely August 7, 1936. On November 16, 1936, the receiver filed a final account, which was stricken off for defects in form, and, on January 29, 1937, the present account was filed.

From the time operation of the plant was suspended until the time of the public sale of all its assets, the receiver received several requests for information concerning the assets of the corporation from persons who expressed interest in purchasing some or all the assets. There is some evidence in the record to the effect that there was a rather active market for silk throwing machinery during the period of the NRA, although this was disputed by the witnesses familiar with the trade. The receiver consulted with several prospective purchasers, many of whom were interested only in parts of the machinery. The machinery in the corporation's plant has been obsolete since the beginning of the receivership, due to the fact that the market for its product, known as "shiffling," disappeared a few years ago. Although the machinery is convertible for use in making other kinds of silk products, its conversion would entail considerable expense. This fact seriously impaired the saleability of the plant and machinery.

After carefully reviewing all the evidence, I am convinced that the exceptions relating to salary and traveling expenses of C. W. Bennett, and to wages paid to workmen in the plant, are entirely without merit and should be dismissed. These expenses were incurred over a very short period of time while the receiver operated the plant in an honest effort to rehabilitate the business. Mr. Bennett's services were clearly worth the salary paid him and the expenses incurred by him in attempting to get business were not excessive, but were reasonable. The loss incurred during the operation of the business caused no depletion in the assets of the estate, but was absorbed by the Wyoming National Bank of Wilkes Barre, which has waived any right which it may have on that account to participate in the assets now remaining in the receiver's hands. Operation of the business was concurred in by all parties in interest, including the exceptant, and it cannot be said that the receiver should have realized the hopelessness of the project any sooner than he did.

Exceptions 1 and 31 as stated are clearly without merit. The receiver in his account charged himself with the sum of the inventory and appraisement and credited himself with the loss. This was entirely proper. Lerner v. Arista Trouser Company, Inc. (D.C.) 12 F.Supp. 83. However, exceptant contended at the hearing that because of the negligent and careless manner in which the receivership was conducted, the difference between $900 received for the property at the sale, and the sum of the appraisement, $29,986.90, was lost, and that the receiver should be surcharged that amount. Although not properly raised, I shall discuss that question also.

This was an unsuccessful receivership. The receiver did not follow carefully the instruction of the court, and was apparently indifferent as to his duties as receiver. It is true that he served without compensa-

tion; nevertheless, his duties as receiver were the same as those of a receiver who receives compensation for his services.

The question before the court, however, is whether the estate has suffered loss due to the negligence of the receiver. It is the contention of the exceptant that by failing to apply to the court for leave to sell the assets of the corporation for a period of two years from the cessation of operations, the receiver caused the assets to depreciate in value and allowed an active market to slip away. There is nothing in the record from which it could be found that the property of the corporation lost value due to deterioration during the period it lay in idleness. No evidence of such loss was introduced.

To surcharge a receiver on the ground that he did not sell assets at a time when the market was favorable, there should be clear evidence that there was a favorable market at a time when the property could have been sold, and it should appear that the receiver's failure to apply for leave to sell was due to negligence and indifference and not to a reasonable exercise of discretion.

The receiver testified that he did not show any interest in offers for parts of the machinery, because he was of the opinion that a better price could be realized for the land, buildings, and equipment as a whole. It is common knowledge that there was no active market for such a business property during the years this plant was kept in idleness. Although there was some evidence of activity in the silk machinery market, no one testified that there was a market for machinery equipped to produce "shiffling." The receiver testified that he delayed in applying for leave to sell in the hope that the passage of time would see a rise in the market for the property.

No inference of fraud or neglect can arise from the fact that the property was sold for the small sum of $900, which is $29,086.90 less than the appraised value. Appraised value does not necessarily reflect market value. In the present instance, the property was purchased by the first mortgagee, which had a very large investment in the plant and enjoyed a distinct bidding advantage over other bidders due to its prior liens. Clearly the price bid at the sale has no bearing on the value of the property at that time.

It is my conclusion that there is no basis for surcharge of the receiver. In failing to sell the assets of the corporation sooner, the receiver was acting within the scope of his broad discretion and there is nothing to indicate that a more prompt sale would have produced a better price.

All the exceptions should be dismissed.

Now, the exceptions filed by the First National Bank of Wyoming, Pa., to the amended account of the receiver are dismissed, the account is confirmed as filed, and the receiver is directed to make distribution of the assets remaining in his hands in accordance with the schedule of distribution contained in said account.